1 | **Thomas E. Beck, Esq.** (State Bar No. 81557)
THE BECK LAW FIRM
2 | POST OFFICE BOX 101
Los Alamitos, California 90720
3 | Telephone No. (562) 795-5835

4 | Email: thebecklawfirm@gmail.com

5 | Attorneys for Plaintiffs

6

7

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10

11 | SHAUN MARSHALL,           ) CV 8:20-cv-00916-DOC-ADSx
ANGELIQUE CRAWFORD,        )
12 | IZABELLA MARSHALL, A       ) **JOINT DISCOVERY STIPULATION**
MINOR BY HER GUARDIAN      ) **PURSUANT TO LOCAL RULE 37-**
13 | AD LITEM, SHAYLA           ) **2.2**
MARSHALL, A MINOR BY HER   )
14 | GUARDIAN AD LITEM,         )

15 |                Plaintiffs,  )

16 |                             )
                v.             ) **Date:**    **3/31/ 2021**
17 |                             ) **Time:**    **10:00 A.M.**
                             ) **Ctrm:**    **6B**
18 | COUNTY OF LOS ANGELES,     )
DEPUTY AYUB MANJRA         )
19 | #531114, individually and as a )
peace officer, DEPUTY M.    )
20 | PEREA # 602466, individually and )
as a peace officer, DOES 1-10, )
21 | individually and as a peace officer, )

22 |                Defendants.  )

23

24 |     The parties (Plaintiffs and defendants County of Los Angeles, Manjra, Perea)

25 | hereby stipulate that the following discovery dispute issues remain to be decided by

26 | the Court following the personal conference and meetings between the attorneys for

27 | the parties as required by Local Rule 37-2.2

28 | ////

1

1

## TABLE OF CONTENTS

2

**Page**

3  PLAINTIFFS' INTRODUCTORY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . 2

4  DEFENDANTS INTRODUCTORY STATEMENT. . . . . . . . . . . . . . . . . . . . . . 9

5  REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED
   ON DEFENDANT COUNTY OF LOS ANGELES Set 1, dated 8/9/11. . . . . . . 13

6     REQUEST  FOR PRODUCTION NO. 10. . . . . . . . . . . . . . . . . . . . . . . . 13

7     RESPONSE TO REQUEST NO. 10. . . . . . . . . . . . . . . . . . . . . . . . . . . 13,14

8          PLAINTIFFS' CONTENTIONS TO REQUEST NO. 10. . . . . . . . 15

9          DEFENDANTS' CONTENTIONS TO REQUEST NO. 10. . . . . . 26

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PLAINTIFFS' INTRODUCTORY STATEMENT

This is an action brought under 42 USC § 1983 for special, general and punitive damages against the County of Los Angeles, deputies Ayub Manjra and Michael Perea, both members of a Special Assignment Operation (SAO) detailed out of Lakewood Station in the City of Lakewood, County of Los Angeles. The First Amended complaint alleges violations of 4th and 14th Amendment the gist of which is that the individual deputy defendants conspired to willfully "frame" plaintiff Shaun Marshall on a drug possession for sale charge they claim they personally witnessed January 8, 2019 in the City of Bellflower. Defendant Deputy Manjra authored an arrest report claiming Marshall sold methamphetamine to Samuel Contreras in the deputies presence by way of an alleged "hand to hand" transaction while standing behind a U-Haul truck parked at 16448 Cornuta Street Bellflower, CA. Additionally, Manjra booked .7199 grams of methamphetamine as if it had been found on Marshall. These representations were proven to have been completely and intentionally fabricated. The criminal case Deputy Manjra caused against Marshall was dismissed March 6, 2019. But vindication against the made-up drug charge did not end the harm Manjra caused Marshall and his wife (co-plaintiff Angie Crawford) and their two minor girls, Izabell and Shayla Marshall. In addition to misleading the prosecution, the defendants mislead a Bellflower S.A.G.E. DA (Georgina Ruiz) who caused Shaun's business (Curt's Wheel & Tire Co. "Curt's") to lose its lease, and cost Shaun his business and income sources. This same false drug crime accusation was passed by Manjra to the County Department of Child Protection Services (CPS) and the Department of Child and Family Services (DCFS). CPS agents believed Manjra's story. They removed the minors from plaintiffs February 23, 2019 to foster care until November, 2019 on the grounds that Shaun Marshal posed a danger to his children by supposedly dealing drugs. As outrageous and impossible as this may sound, it has fortunately been proven true. Manjra and Perea's wrongdoing was laid bare and they are about to criminally charged for the felonies committed against the

1  plaintiffs.

2

3  **THE DETAILED FACTS**

4  Shortly after 5pm January 9th, 2019 Shaun Marshall left Ultimate Performance
5  where he was employed by Randy VanDerbrink as a mechanic to go around the
6  corner to Curt's Wheel and Tire, (Curt's) an auto shop Shaun's father had started
7  with Randy. When Shaun's father passed away in 2012, Shaun went to work for
8  Randy to buy out Randy's share of Curts and continued to service his own customers
9  when he was not working at Ultimate. Curts leased space in a garage at 16448
10  Cortuna Ave Bellflower leased to Shaun by Virgil DeVries. Plaintiffs lived with
11  Angie's mother Kathlene Crawford in Orange County. In addition to the wheel and
12  tire shop, Angie and Curt ran a U-Haul rental business and contracted with U-Haul
13  Corp to service and repair rental vehicles. In March 2018, Shaun subleased 3 of
14  Curt's service bays to Gary Bishop. Bishop was an unreliable tenant, did not pay his
15  rent on time and neighbors complained he kept the shop open at all hours of the
16  night. Virgil spoke to Shaun about the complaints about Bishop. Shaun terminated
17  his relationship with Bishop after 3 months, never to see him again. Bishop, it turned
18  out, was actually a drug dealer. He was arrested in Lakewood by SAO team members
19  in July 2018. He was convicted and sentenced in October 2018.

20  Deputy Manjra's assignment put him in close contact with DDA Georgina
21  Ruiz. As a S.A.G.E. deputy, Ruiz's mission was to enforce "quality of life" laws,
22  clearing crime infested locations in the City of Bellflower. Manjra spoke to Ruiz
23  about Bishop and informed Ruiz that 16448 Cornuta that according to his informants,
24  was habituated by gang members who trafficked in stolen weapons and carried on
25  a drug business. Manjra lead Ruiz to believe Bishop was arrested at 16448 for
26  dealing drugs. Ruiz told Manjra of her efforts to close down 16448 and that if Manjra
27  got any arrests out of there, to inform her. This news caused Ruiz to identify Virgil
28  DeVries as the property owner and invited Virgil to her office in July 2018,

3

informing Virgil of what Ruiz was made to believe by Manjra. Ruiz threatened Virgil with legal action if he did not "clean up" 16448. Virgil took this news to Shaun but having known Shaun since childhood, he trusted Shaun's explanation that Shaun was not the problem, Bishop was and Bishop was gone. At the same time, Deputy Manjra was starting to make   contacts with Angie Crawford. He drove by the shop and attempted conversation with her. On another occasion, Manjra pulled Angie and a customer over for no lawful reason and searched her, finding $700 cash.  Manjra wanted to know why she had so much money on her. Angie explained it was the customer's money and they were on their way to purchase an engine.  Manjra let her go about her business.

Against this background, Shaun was on his way to meet two customers one of whom was David Frey and another by the name of "James." James had a passenger, Sammy Contreras. They were in the shop when Shaun arrived. Shaun informed James he would have to wait until Frey's car was worked on. James agreed to wait. Contreras, who nobody knew, decided he did not want to wait and walked out of the shop onto Cornuta Street and turned left, talking on his cell phone. As Contreras was leaving, Shaun pulled a floor jack from the building into the yard and Frey's vehicle. At that moment he realized he had left is air hammer needed to remove tires, at Ultimate. He announced he was running to Ultimate before it closed at 5:30 and stepped onto Cornuta Street. Contreras was yards ahead of him when Manjra and Perea's patrol SUV raced toward Contreras, crossing onto the wrong side of the street.  Manjra jumped out and grabbed Contreras' backpack while Perea went toward Shaun. Manjra confronted Contreras who admitted having meth on his person and also being on probation. Manjra took the meth and put it on the hood of the SUV with the backpack. Manjra asked Contreras about Shaun, explaining he'd seem them both come from the same place. Contreras told him he just met Shaun, did not know him. Contreras was handcuffed and placed in the back of the SUV. Manjra joined Perea and Shaun. They wanted to know who Conteras was. Shaun explained he was

4

a customer's passenger, did not know him and was walking behind Contreras to get his tools at Ultimate, not far away. Manjra cuffed Shaun and put him into the back of the SUV with Contreras. The SUV was then backed up to the front of Curt's where numerous other deputies arrived, communicated with the defendants and entered the yard, searching through customer's vehicles and reading VINS. When they finished, defendants drove Shaun and Contreras to the Lakewood station. Nothing was said en route among all of them. Contreras did not understand why Shaun was being arrested and was not told.

At Lakewood station Shaun and Contreras were separated and booked. Angie was in Signal Hill when she got a call from the shop informing her Shaun had been arrested and nobody knew why. Angie went back to the shop to close it up and went home. Later in the evening Shaun phoned perplexed about why he was in jail. Nobody told him anything. The telephone calls were recorded. Angie figured out what the bail was ($30,000) and made arrangements to put up the bail for Shaun's release.

The next morning Angie and Frey showed up at Lakewood station to bail out Shaun and get his property back. Frey was given his key. Angie, Shaun and Frey were made to wait for 45 minutes to file a false arrest complaint with the watch commander that morning. This person refused to take their complaint and also refused to identify himself-all contrary to LASD regulations and California law. Angie persisted in trying to leave a complaint but was met with negative results. She then asked to see Shaun's arrest report. Surprisingly, the watch commander gave it to them and they left. On the way back to the shop, they studied the report and realized all of what Manjra and Perea claimed to have been seen by them would have been captured by the shop's security cameras and disprove Contreras and Shaun were ever together to carry out the alleged hand to hand sale. They found the footage and perserved it. That afternoon they went back to Lakewood station to file a false arrest complaint knowing they had video proof that refuted what was written. A new Watch

5

Commander (Lt. Moses) took their complaint but he too refused to classify it as a false arrest. Angie insisted she would not leave until the form included the words "false arrest." Lt. Moses placated her by writing "false arrest" but only onto her copy of the complaint form. They returned to the shop where they discovered a business card had been left by an CPS representative. Manjra had maliciously reported Shaun's supposed drug dealing arrest to Child Protective Services.

As the result of Ruiz's communication with landlord Virgil in which she again threatened legal action unless Shaun was evicted, Virgil confronted Shaun about his dealing drugs and multiple arrests as reported by Ruiz. Virgil gave Shaun until February 28th to clear out the shop. Randy at Ultimate also got wind of Shaun's drug dealing arrest and impeding eviction from Curt's and promptly fired him.

Shaun appeared in Superior Court January 30th with his video evidence proving the lies Manjra and Perea were telling, naively believing he would show the recording to the judge and the case would be dismissed. He attempted to give it to his public defender who showed no interest and was told to return to court in February. He made his second appearance and gave the video recording to a newly appointed public defender, expecting she would show it to whomever would need to see it and have the case dismissed. He returned March 6th to be told the case was dismissed but not why. He believed his video recording carried the day.

The family used the months of January and February to sell off, auction or throw away the shop's equipment in advance of the 28th. On the 23rd of February Shaun was not present. Angie, Izabella, Shayla, Angie's mother and friends were at the shop clearing it out. Defendant Manjra, Det. Michael Garfin, other deputies and DCFS agents showed up at the shop with an expedited removal order for Izabella and Shayla. Shocked and surprised, Angie and her mother were helpless as the girls were taken away and placed in foster care. A few days later Plaintiffs were required to appear in Los Angeles Family Court being accused of being unfit parents because of Shaun's supposed drug dealing that Angie supposedly allowed endangering the

minors. Manjra and DA Ruiz worked with the DCFS case workers, misinforming them that the family lived at the "squalid" shop, that drugs were found on the premises and multiple drug arrests had taken place there, Bishop's, Shaun's and Contreras' among them.

Plaintiffs were separated from their daughters and the daughter from one another for 10 months on account of Manjra's lies. They employed lawyers to defend the DCFS accusations and incurred debt while neither was able to earn a living to pay for legal representation. The contents of the shop were lost as was Curt's Wheel and Tire which went out of business.

Discovery discloses Manjra emailed DA Ruiz 90 minutes after he arrested Shaun and Contreras, instructing her to get Shaun's eviction going. He sent her his arrest report shortly thereafter claiming that he and Perea were watching as Contreras and Shaun transacted a "hand to hand" drug sale behind one of the U-Haul trucks in Shaun's yard, and that Manjra supposedly found meth in a Marlboro cigarette pack Manjra claimed he saw Shaun place down on the bumper of the U-Haul truck. Ruiz wrote to Virgil the next morning insisting he visit with her immediately again, condemning Virgil's property as a den of iniquity, that multiple drug crime arrests had been made out of 16448, including Shaun's. Discovery further discloses that after Manjra got wind of Angie's false arrest complaint, he visited the Bellflower District Attorney's office asking to dismiss the criminal case against Shaun on the false ground that he was allegedly unable to identify Shaun as the perpetrator of the purported hand to hand with Contreras. The dismissal decision was approved by the Bellflower DA office head a few days before Manjra and CPS/DCFS agents showed up to take the girls away. Dismissal had nothing to do with the video evidence it turned out. Despite his knowledge that the criminal case had been dismissed, Manjra continued for months to mislead DCFS case workers into believing Shaun was a drug dealer and a threat to his minor children.

Manjra's immediate supervisor, Sgt Chris Roberts, was given the plaintiff's

7

personnel complaint to investigate. Sgt. Roberts closed the complaint investigation without any real investigation. Even though he knew Shaun's criminal case had been dismissed in March, a month later Roberts wrote a disposition memo to Lakewood Captain David Sprenger exonerating Manjra's conduct as "reasonable" and that Marshal had to take up his drug planting accusations in defense of the criminal charges that he knew were no longer pending. Sgt. Roberts did not interview Shaun or ask to see Shaun's video. He did not interview Contreras, but instead made it appear in his memo that Contreras and Marshal were "friends."

In April 2020 LA District Attorney Jackie Lacey learned of the videotaped evidence and what Manjra and Perera had done. She ordered LASD's Internal Criminal Investigation Bureau (ICIB) to investigate and bring the case to JSID (Justice System Integrity Division) for prosecutions of Manjra and Perea. LASD's internal investigation confirmed Shaun's security video fully refutes what Manjra and Perea claim they witnessed.

This action was filed May 18, 2020. All defendants have appeared and answered the complaint.

Plaintiffs issued 26 inspection demands to the County beginning October 19, 2020. The County timely objected and/or promised further responses to the first (No. 1-26). The objections were not accompanied by a Custodian's declaration nor has the defense produced a privilege log identifying what records it is withholding and on what grounds.

Plaintiffs initiated meet and confer communications on 12/12/20. (Exhibit A Beck declaration). Defendants followed through with some additional discovery. Ultimately on February 12, 2021, defense counsel affirmed by e mail that most objections would be withdrawn with respect to Inspection Demand No. 10 but that LASD continues to object to No. 10 and will not produce the records without a court order. thereby commencing Plaintiffs' compliance with Central District Local Rule 37-1 and 37-2.2.

1

**DEFENDANTS INTRODUCTORY STATEMENT**

2

3

4

5

This case arises from the mistaken identity arrest of Plaintiff SHAUN MARSHALL ("Marshall") on the evening January 8, 2019. Plaintiffs allege that false statements in an incident report resulted in Marshall's arrest and the temporary placement of his children in foster care. Defendants deny the allegations.

6

7

8

9

10

11

12

13

14

15

The instant discovery dispute concerns Plaintiff's request that Defendant County of Los Angeles ("County") produce results from a specific search query of the Los Angeles County Regional Identification System ("LARCIS"). LARCIS is a proprietary local criminal history database that is used to identify persons arrested in the County. A LARCIS record generally contains the type of offense; date and location of the arrest; and the names of persons associated with the incident. Here, Plaintiff requests the County search the database and produce the LARCIS record of every person arrested by Defendants Deputy Michael Perea ("Dep. Perea") and Deputy Ayub Manjra ("Dep. Manjra") for a drug related offense in the last five (5) years.

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff's request is overbroad because it seeks local criminal history information about third parties which have no logical relationship to the allegations in the complaint. Moreover, utilizing the LACRIS database to generate documentation in connection with a non-law enforcement related purpose would violate California law and invade the privacy rights of third parties. This type of aggregated law enforcement information is confidential under the *California Penal Code* and the LARCIS database is not authorized for use in civil proceedings. LASD Policy 3-07/210.05 expressly provides that the use of the LARCIS resource is restricted to a *law enforcement related activity*. Likewise, *California Penal Code* makes it a misdemeanor to furnish criminal history information to a person not authorized to receive the record. On balance, the public's interest in disclosure of this information is outweighed by the privacy interests of a third parties in their criminal arrest history, particularly when such arrests have no logical relationship to this case.

1  Accordingly, in the absence of a Court order, the County cannot comply with
2  Plaintiff's document demand.

3  **THE DETAILED FACTS:**

4  **Curt's Wheel and Tire**

5  After his father died, Plaintiff Shaun Marshall ("Marshall") took over Curt's
6  Wheel and Tire ("Curt's"), located at 16448 Cornuta Avenue in the City of
7  Bellflower. Unlike his father, Marshall did not have the experience or discipline to
8  run a successful business. When Marshall assumed control of the business, he
9  removed all exterior commercial signage and began living there illegally with his
10  children and girlfriend, Plaintiff Angelique Crawford ("Crawford"). To earn extra
11  money, Marshall began subletting portions of the Subject Property to drug dealers
12  and known gang members. The Subject Property slowly transformed from a
13  reputable business into a hot spot for various forms of criminal, drug, and gang
14  activity.

15  The City started receiving numerous complaints about the high foot traffic
16  going to and from the Subject Property, twenty-four (24) hours a day. Eventually,
17  the Subject Property caught the attention of SAGE, a jointly led program by the City
18  and the Los Angeles District Attorney's Office ("LADA") that utilizes criminal
19  nuisance abatement strategies to reduce street gang violence and narcotics-related
20  activity. On April 16, 2018, the LADA served Marshall's landlord with a nuisance
21  abatement notice due to the continued and escalating public safety concerns.
22  Eventually, Marshall's landlord pressured him to evict Gary Bishop ("Bishop") from
23  the Subject Property after he was arrested for trafficking substantial quantity of
24  methamphetamine. However, the public safety concerns continued to increase despite
25  the eviction.

26  **2.  The Mistaken Arrest**

27  On the evening of January 8, 2018, Deputies Manjra and Perea were patrolling
28  the neighborhood near the Subject Property in their marked police vehicle. While

1   approaching the Subject Property in their patrol vehicle, the Deputies witnessed what
2   appeared to be a hand-to-hand narcotics transaction between two suspects standing
3   near a U-Haul truck parked at the Subject Property. Although the Deputies were
4   more than two hundred (200) feet away from the Subject Property at the time of the
5   narcotics sale, Marshall was directly in the Deputies' line of site because he was
6   standing near the U-Haul truck and the narcotics suspects.  When the suspects
7   spotted the Deputies driving towards them, one of them immediately discarded an
8   object on the bumper of the U-Haul truck and both started walking down the
9   sidewalk, away from the Subject Property. Seconds later, Marshall also began
10  walking down the sidewalk, right behind one the suspects.

11      The Deputies contacted Marshall as he was walking down the sidewalk.
12  Samuel Contreras ("Contreras"), the suspect Marshall appeared to be walking with,
13  immediately advised the Deputies that he was on probation and was therefore
14  required to consent to police searches. Marshall advised the Deputies that he lived
15  at the Subject Property and was walking to work. When Dep. Manjra disclosed that
16  he had observed both Marshall and Contreras at the Subject Property, Marshall did
17  not dispute the observation and stated "*well, I know him, but I don't. He was just
18  visiting.*" Eventually, Contreras admitted that he had just purchased narcotics. After
19  searching his person, the Deputies found two (2) plastic baggies containing
20  methamphetamine in Contreras' front pants pockets.

21      The Deputies then went back to the Subject Property and found more
22  methamphetamine inside a Marlboro cigarette box on the bumper of the U-Haul truck
23  in the parking lot.  Given Marshall and Contreras were the only individuals the
24  Deputies had seen walking away from the Subject Property in the same direction
25  after the narcotics sale, coupled the fact that they recovered narcotics from Contreras
26  and from the vehicle that had been in the immediate vicinity of Marshall, the
27  Deputies mistakenly believed Marshall was the other suspect they had observed
28  engaged in the narcotics transaction.

### 3.   Surveillance Footage

Later acquired surveillance footage taken from a fixed security camera at the Subject Property revealed exactly how the mistaken identification occurred. Specifically, the footage captures the moments right before Contreras and the other suspect engage in the narcotics transaction while standing in the immediate vicinity of Marshall. After completing the narcotics transaction, the surveillance footage shows Contreras and the other narcotics suspect walk away from the Subject Property in opposite directions on the sidewalk, just as the Deputies' patrol vehicle is approaching. Seconds later, Marshall can also be seen leaving the Subject Property and walking right behind Contreras on the sidewalk.

The near simultaneous movement away from the Subject Property by more than one individual immediately after the narcotics transaction would have induced an imperceptible change blindness in anyone observing the Subject Property from the perspective of the Deputies. Just like the psychology behind many well-known card tricks, as the Deputies attention was misdirected by the movements of Marshall and Contreras, the other narcotics suspect walked away in the other direction completely undetected. After the Deputies found narcotics on Contreras and at the location where they had just seen Marshall and Contreras, the Deputies had no reason to doubt their perception of the events at the time of Marshall's arrest.

### 4.   Department of Children and Family Services

When social workers arrived at the Subject Property to execute a lawfully issued removal warrant for Plaintiffs' minor children, they discovered evidence that Plaintiffs' children had been living at the Subject Property in unsafe conditions. Plaintiffs had the ability to challenge the basis for the removal within a few days after the execution of the removal warrant but the dependency court nevertheless determined that the continuation of the children in Plaintiffs' home was contrary to their welfare, effectively cutting off any liability for damages or suffering incurred as a result of the Children's placement in foster care. See *Watson v. County of Santa*

1  *Clara* (2012) U.S. Dist. LEXIS 172678.

## PLAINTIFFS REQUEST FOR PRODUCTION OF DOCUMENTS PROPOUNDED ON DEFENDANT COUNTY OF LOS ANGELES Set 1, 1-26 dated 10/19/20.

### REQUEST FOR PRODUCTION NO. 10.

1.　　A printout from the Event Index, currently known as **LARCIS**, for any "hit" under Stat Codes 104 and 181 arrests by Defendant Deputy AYUB MANJRA and Deputy M. PEREA in the 7 years prior to January 8, 2019 through the date of your responses.

After meeting and conferring, Plaintffs reduced the scope of this request to 5 years upon learning neither Manjra or Perea were not assigned to positions in which they would be making these specific kind of drug crime arrests for 7 years.

### RESPONSE TO REQUEST NO. 10.

**Objection**: This request overbroad in time and scope. The remoteness in time between alleged misconduct and the incident at issue diminishes the probativeness of any prior misconduct or in demonstrating a policy necessary to establish a *Monell* claim. See *Lallemand v. County of Los Angeles*, No. CV 17-0781, 2018 WL 6136814, at *9 (C.D. Cal. Jan. 12, 2018)[holding that discovery request seeking ten years of officers' personnel files was overbroad, and compelling production as to records from only last five years]. Moreover, this request is overbroad in that it seeks information relating to arrests, regardless of whether the arrest was alleged to be the product of fabricated evidence or some other form of misconduct.

Further, this request seeks the disclosure of law enforcement records which are confidential under California law and are protected by the law enforcement privilege, official information privilege, and the self-critical analysis privilege. Further, this request invades the privacy rights of the named defendants and third parties not

otherwise associated with this litigation.

Most importantly, this request seeks information protected by the ongoing investigation privilege. Here, there is currently an ongoing internal affairs and criminal investigation relating to the incident which gave rise to this action. The disclosure of any records relevant to these ongoing investigations could plausibly undermine these investigations, interfere with criminal or administrative proceedings, deprive this deputy of a right to a fair trial or an impartial adjudication, disclose the identity of a confidential source, and constitute an unwarranted invasion of personal privacy.

Accordingly, any law enforcement records regarding the ongoing investigation into the incident or law enforcement records concerning prior investigations which have probative value to material issues sought to be determined in the ongoing investigations are privileged from disclosure. See *Shelley v. County of San Joaquin*, 2015 U.S. Dist. LEXIS 58285, 2015 WL 2082370 (E.D. Cal. May 4, 2015) [holding that the investigative privilege barred public disclosure because such disclosure "plausibly could undermine these investigations"].

Additionally, this request seeks information that may be related to an ongoing criminal investigation involving third parties to this litigation. As a result, there is also a plausible risk that the disclosure of this information could undermine current or ongoing criminal investigations or prosecutions for drug related crimes.

After meeting and conferring, on February 17, 2020, the defense agreed to withdraw all objections to No. 10 save two: relevance/overbreadth and third party privacy as follows:

**Relevance/Overbroad** – . Discovery must be narrowly tailored to reveal the nature and extent of the conflict, and must not be a fishing expedition. *Groom v. Standard Ins. Co.*, 492 F.Supp.2d 1202, 1205 (C.D.Cal.2007).Here, document demand no. 10 is not narrowly tailored and appears to be a fishing expedition.

14

1   Unreliable statistical data concerning the Deputies' prior drug arrests will not lead
2   to the discovery of admissible evidence. The fact that a LARCIS report may identify
3   prior instances where the deputies made a drug arrest is not relevant to proving
4   "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of
5   mistake, or lack of accident" in this case. The only fact this information tends to
6   prove is that the deputies may have been identified as an arresting officer in a prior
7   drug arrest. Because the request is not narrowly tailored to discover prior arrests
8   involving the same allegations of misconduct, it is overbroad.

9       **Unwarranted Invasion of Third Party Privacy** – The information sought by
10  demand no. 10 would reveal the names of third parties to this litigation who were
11  previously arrested for a drug related offenses. Notably, LARCIS was designed to
12  track the criminal history of individuals and can only be used for a  specific law
13  enforcement related purpose. It was not, however, designed to track the arrest history
14  of deputies. Likewise, Los Angeles County does not utilize LARCIS in civil matters.
15  In Los Angeles County, this type of aggregated law enforcement information is not
16  freely available to the public or attorneys  and is certainly a highly  personal matter
17  for the individual arrested.  Moreover, these third parties may or may not have been
18  guilty of the offense and the disclosure of this information could adversely impact
19  reputation, job prospects, or standing in the community. Accordingly, the public's
20  interest in disclosure of this information is outweighed by the privacy interests of a
21  third parties in their criminal arrest history,  particularly when such arrests may not
22  have led to a conviction and have no logical relationship to Plaintiff or the
23  allegations in the complaint.

24          **PLAINTIFFS' CONTENTIONS TO REQUEST NO. 10.**
25          **LARCIS AND STATUS CODES EXPLAINED**

26          In the late 80's Plaintiff's counsel learned, through a deposition of an LASD
27  executive, of the existence of a record keeping system employed by LASD, then
28  called the "Event Index."  It was widely used and made available to other law

1    enforcement agencies including LAPD. The Event Index became known as LARCIS-

2    -an electronic data base system enabling the department to conduct investigations

3    from a computer terminal.[1] For example, if an investigation concerned insurance

4    fraud, using LARCIS, the department has the ability to identify each crime or arrest

5    report in which the suspect was claiming to be a victim of an auto accident or arson.

6    If there were "hits" the next step would be to examine those crime reports to learn if

7    there was a pattern ("MO") or if the parties or witnesses were different or the same

8    to the current investigation and much more depending of the facts of each

9    investigation. The LARCIS print out exemplar appended to Plaintiffs' counsel's

10    declaration was provided by LASD, in response to the identical Inspection Demand

11    as No. 10 in another §1983 lawsuit, LASD produced the list of dozens of the

12    particular kind of arrests in which the subject deputy defendant (Boghosian, Gregory)

13    claimed to have been the victim of a violation of Penal Code 148

14    (resisting/obstruction) or PC 243 (battery/force or violence against a peace officer)

15    by URN number. The URN numbers, in turn, trace to the individual reports for each

16    instance[2] and ultimately provided the plaintiff multiple 148 and 243 arrest reports

17

18       [1] LARCIS printouts are *not* CORI ("Criminal Offenders Record

19    Information) "rap" sheets to which Penal Code § 13300 *et seq*. applies "Criminal Offender Record Information" or "CORI" means records and data compiled by

20    criminal justice agencies for purposes of identifying criminal offenders and of maintaining as to each such offender a summary of arrests, pretrial proceedings,

21    the nature and disposition of criminal charges, sentencing, incarceration, rehabilitation, and release. Cal. Code Regs., tit. 22, § 100343.1. The exemplar of a

22    LARCIS search appended to Beck's declaration (Exhibit A) identifies alleged victims, witnesses, suspects and informants-omitting arrest summaries, criminal

23    charges, dispositions, sentencing, incarceration, rehabilitation and release.

24

25       [2] In this case Plaintiffs' Inspection Demand No. 9 seeks, "Each historical unredacted crime and arrest reports in which the individual defendants arrested

26    and/or booked citizens for alleged violations of Health and Safety Code sections 11377(a)(possession) or 11378, (possession for sales) in the 7 years prior

27    to January 1, 2019 through the date of your responses to this request")-to which the defense no longer objects-asked for the crime and arrest reports that only a

28    LARCIS inquiry would produce but object only to the LARCIS inquiry. The Defense's failure to assert the current privilege objections to the LARCIS printout

1   that identified additional plaintiff's trial witnesses competent to testify concerning

2   Deputy Boghosian's claims of being a victim of those kinds of crimes were false and

3   spiteful "contempt of cop"-arrests proving the defendant deputy to have engaged in

4   a pattern of conduct admissible under FRE 404(b) and FRE 405 and FRE 608

5   dishonest character testimony as the true victims of deputy Boghosian's abuses.

6   Every crime and arrest report written by LASD deputies contains a 15 digit

7   URN (Uniform Report Number). The last three digits are "Status Codes" which

8   identify the type and kind of crime for which the arrest and/or investigation exists.

9   The department publishes its recognized status codes as part of its Manual. Deputies

10  are instructed how and when to choose and use them. Plaintiff Marshal's URN was

11  9-19-00553-1334-104. Sometime later, the status code was changed to 181, which

12  is the way it appears on LASD's Scientific Services Bureau (Crime Lab) analysis of

13  the meth allegedly found on Shaun by defendant Manjra.

14  In addition, all LASD crime and arrest report face pages (Form SH-R-49)

15  employ an alpha shorthand system to identify Victims (V), Witnesses (W),

16  Informants (I), Parties (P), Suspects (S), Subjects (SJ), Patients (M), Suspect/Victim

17  (S/V) and Subject/Victim (SJ/V). In Marshall's and Contreras' report Deputy Manjra

18  coded himself as (I) Informant consistent with his claim that the investigation started

19  from a personal observation.  Marshall was coded S/1 (Suspect) and Contreras was

20  coded S/2.)

21  Thus in order to find each arrest in which Manjra or Perea claimed to have

22  been (I) informants, or witnesses (W) as they claimed in Marshall's case, LARCIS

23  would be instructed to search by the deputies names coded as (I) or (W) together with

24  stat codes of 104 or 181. The result of this kind of inquiry will produce a print out

25  as appended to Beck's declarations a Exhibit A.

26  Applying the same investigative discovery techniques as in Deputy

27
28  (#10) waived any objections that could have been asserted as to #9. FRCP 34,
    *Ramirez v. County of Los Angeles* 231 F.R.D. 407, 409 -410 (C.D.Cal.,2005).

17

1  Boghosian's case, Marshal and Crawford's Inspection demand #10 makes the same
2  kind of inspection demand designed to find Manjra's and Perea's drug arrests using
3  the two stat codes applicable to Plaintiff's case-104 & 108), together with their names
4  and Witness or Informant coding as the search criteria with the expectation the arrest
5  reports will yield admissible testimony and other evidence..

## RELEVANCE/OVERBREADTH OBJECTIONS

Plaintiff's discovery effort seeks to identify potential victims and writings
leading directly to testimony in Plaintiff's trial about being falsely accused of having
carried out a "hand to hand" drug sale allegedly witnessed by Manjra and/or Perera.
This was the modus operandi chosen by the defendant deputies to justify arresting,
booking and prosecuting Shaun Marshal.. The object of the discovery is to locate the
MO in other arrests by these deputy defendants. The defense contention that this kind
of discovery will not lead to 404(b) evidence reveals a complete misunderstanding
of the LARCIS system as well as FRE 404(b). Witnesses and testimony uncovered
by LARCIS discovery is made admissible by F.R.E. 404(b)("may be admissible for
another purpose, such as proving "motive, opportunity, intent, preparation, plan,
knowledge, identity, absence of mistake, or lack of accident"), by F.R.E. 405
(opinion or reputation testimony regarding defendants' character traits for
untruthfulness)[3]      and F.R.E. 608(b)(specific instances of dishonest behavior

[3] ("An adequate foundation must be laid in order for opinion testimony
concerning another witness's character for untruthfulness to be admissible. Such a
foundation is laid by demonstrating that the opinion witness knows the relevant
witness well enough to have formed an opinion.", *Wilson v. City of Chicago*, 6
F.3d 1233, 1239 (7th Cir. 1993) (error to exclude testimony of witness who "spent
fair amount of time" with subject witness), "Accordingly, Plaintiffs motion to
exclude testimony as to Plaintiff's character for untruthfulness without first
showing the witness "enjoy[s] a close personal relationship with Plaintiff" is
denied without prejudice. While this may constitute a sufficient foundation, the
standard is not that high. *The testimony need only be based on the witness'
personal knowledge and sufficient perceptions connected to the witness' character
for truthfulness or untruthfulness.*" *Hoyt v. Career Sys. Dev. Corp.*, No.
07CV1733 BEN (RBB), 2010 WL 11509107, at *2 (S.D. Cal. May 3,

reflecting on the deputy's mendacious character). *United States v. Fusco,* 748 F.2d 996 (5th Cir. 1984), (Rule 608(b) limits the use of evidence "designed to show that the witness has done things, unrelated to the suit being tried, that make him more or less believable per se")." Federal Rules of Evidence Rule 608, 28 U.S.C.A.

Because "hand to hand" sales transactions are not specially coded, they will only be found by discovering drug arrests in which Manjra or Perera were informants (I) or witnesses (W) asserting hand to hand sales observed by deputies similar to this case. These kinds of responsive reports are needed to complete the discovery. This is done by using the deputy's name, Witness or Informant codes and the applicable stat codes. LARCIS does the work to find the URN file number and with that number, the crime and arrest reports (Plaintiffs' Inspection Demand No. 9) are identified to be scrutinized for hand to hand sales the deputies claim they witnessed. The same methods have been employed to test law enforcement's claims to have smelled the scent of marijuana to justify searches. LARCIS cannot find these fact patterns, but points in their direction with the appropriate search criteria.

Plaintiffs chosen discovery path is not speculative. Indeed it has been fortified by having already uncovered another such report (not through LARCIS, but Manjra's' personnel file) containing an alleged hand to hand sale accusation that took place May 2, 2017 in which Deputy Manjra participated and for which Manjra earned a Unit Commander's Commendation by Lakewood Station Captain David Sprenger, recommended by Manjra's SOA supervisor, Sgt. Chris Roberts-the same one who whitewashed Plaintiffs' false arrest complaint. An inspection demand for the 5/2/17 crime and arrest report is pending compliance by the defense. With two bogus "hand to hand" arrests by Manjra, the response to this Inspection Demand is reasonably certain to uncover the others.

Furthermore, the May 2, 2017 hand to hand sale arrest sheds meaningful light

2010).(italics added). See also: *U.S. v. Turning Bear* 357 F.3d 730, 735 (8th Cir. 2004).

19

1   on why Manjra and Perea would falsely accuse Shaun Marshall of selling drugs out
2   of 16448 Cornuta---secondary gains of praise, professional recognition and accolades
3   by superiors that worked once in 2017 and worked a second time at the start of 2019
4   with Marshal's corrupt arrest. The City of Bellflower and Captain Sprenger issued
5   Manjra's personnel file written accolades praising Manjra's arrest of Shaun Marshall
6   and success in shutting down Curt's Wheel and Tire, although not one of them took
7   account of the fact that Marshall's criminal case was dismissed at Manjra's request,
8   claiming he could not ID Shaun.

9       The LARCIS "hits" being asked for by Inspection Demand No 10 have in the
10  past been proven to unearth probative, admissible testimony in other cases and will
11  undoubtedly lead to similar  admissible evidence in this case. Contrary to the
12  defense's  fishing expedition argument, "No longer can the time-honored cry of
13  'fishing expedition' serve to preclude a party from inquiring into the facts underlying
14  his opponent's case." *Hickman v. Taylor* (1947) 329 U.S. 495, 507 [67 S.Ct. 385,
15  392, 91 L.Ed. 451] Prohibited fishing expeditions cast about looking for something-
16  anything- not yet defined.  In this case the LARCIS discovery has a defined target:
17  modus operandi 404(b) evidence as well as 405 and 608 witnesses identification,
18  testimony and documentary proof to be admitted at trial. The relevance of the "hits"
19  Plaintiffs seek cannot be denied and it would be wrong to call this discovery effort
20  a "fishing expedition." It has proven itself already to have this value in other matters
21  civil and criminal.  LASD's claim they don't use LARCIS in civil cases, only in
22  criminal investigations, has been debunked by the Gregory Boghosian §1983
23  litigation. Furthermore, the department cannot complain that LARCIS investigation
24  techniques do not yield results. They admit that it does when the department is the
25  inquiring party. The LARCIS system has indeed been successfully used to conduct
26  civil discovery by plaintiffs counsel who know how to do it.

27      All that being said, FRCP 26 and settled federal discovery law endorses
28  Plaintiff's discovery efforts. Fed. R. Civ. P. Rule 26 (b)(1) has been recently

amended to cover "[A]ny nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." "Parties are permitted to discover any relevant nonprivileged matter. Fed.R.Civ.P. 26(b)(1). This rule is construed very broadly, encompassing 'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.' *Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978). Discovery is not limited to the issues raised only in the pleadings, but rather it is designed to define and clarify the issues. *Id.* at 351, 98 S.Ct. at 2389. To limit an examination to matters relevant to only the precise issue presented by their pleadings, would not only be contrary to the express purpose of Rule 26...., but also might result in a complete failure to afford plaintiff an adequate opportunity to obtain information that would be useful at the trial. *Stevenson v. Melady,* 1 F.R.D. 329, 330 (C.D.N.Y.1940). This is true not only of depositions but of other discovery devices permitted by the rules. The requirement of relevancy should be construed liberally and with common sense, rather than in terms of narrow legalisms. Discovery of information that has no conceivable bearing on the case should not, however, be allowed. 8 C. Wright & A. Miller, Federal Practice and Procedure, § 2008 (2d Ed.1983 & Supp.1990)." *Miller v. Pancucci* (C.D. Cal. 1992) 141 F.R.D. 292, 296.

Plaintiffs have demonstrated the responses to Inspection Demand No. 10's relevance, and also go step farther by demonstrating how the discovery will lead directly to admissible evidence/testimony at trial. "The Federal Rules of Evidence start from the proposition 'all relevant evidence is admissible.' Fed. R. Evid. Rule 402. Rule 404(b) makes an exception for 'evidence of other crimes, wrongs or acts,

21

1  where the evidence proves *only* criminal disposition.' (citation). But we have held
2  that Rule 404(b) is 'one of inclusion' and if evidence of prior crimes bears on other
3  relevant issues, 404(b) will not exclude it." *U.S. v. Cruz-Garcia* 344 F.3d 951, 954
4  (9th Cir. 2003)(italics in the original). "We have uniformly recognized that the rule
5  is one of inclusion and that other acts evidence is admissible whenever relevant to
6  an issue other than the defendant's criminal propensity." *U.S. v. Mehrmanesh*, 689
7  F.2d 822, 830 (9th Cir. 1982). "The courts have long recognized that testimony
8  regarding the reputation for truth and veracity in a community of a witness is relevant
9  and, therefore, admissible. *Osborne v. United States*, 542 F.2d 1015 (8th Cir. 1976).
10  See also Fed.R.Evid. 608; Neb.Rev.Stat. s 27-608 (Reissue 1975); McCormick,
11  Evidence s 44 (2d Ed. 1972). The trial court erred in excluding the proffered
12  testimony and the error was highly prejudicial." *Steinmark v. Parratt* 427 F.Supp.
13  931, 936 -940 (D.C.Neb. 1977).

14      Nor is the 5 year scope employed by the Inspection Demand overbroad. Any
15  evidence culled from the response to this discovery demand meets threshold
16  admissibility in temporal terms. *U.S. v. Robles* (9th Cir. 2006) 175 Fed.Appx. 918,
17  91 "Here, the eight-year-old prior act was not too remote in time. *See Hadley,* 918
18  F.2d at 851 (ten years); *Ross,* 886 F.2d at 267 (thirteen years); *see also United States
19  v. Spillone,* 879 F.2d 514, 518 (9th Cir.1989) (declining "to adopt an inflexible rule
20  excluding evidence of prior bad acts after a certain amount of time elapses"). 
21  Moreover, regardless of the lapse in time, the evidence was highly probative of
22  establishing the identity of Ludlow's attacker and a motive for the assault. *See
23  Brown,* 880 F.2d at 1014–15."

24      It is important to remember the defense has produced no privilege log, no
25  *Chism*[4] custodian's declaration or any other foundational support for the arguments
26  being asserted to prevent this discovery effort. As such, the objections are
27  unsupported and should be overruled. *Burlington Northern & Santa Fe Ry. Co. v.*

28

---

[4]*Chism v. County of San Bernardino*. 159 F.R.D. 531 (C.D. Cal. 1994)

1  *District Court* 408 F.3d 1142, (9th Cir. 2005), *Ramirez v. County of Los Angeles*, 231
2  F.R.D. 407(C.D. Cal. 2005).

3

4  **Third Party Privacy**

5      Defendants argue that *public* disclosure of the identity of potential trial
6  witnesses derived from the LARCIS investigation would harm the persons arrested.
7  There should be no concern that any of the LARCIS "hits" and the reports it
8  identifies would ever become *public* information. Privacy rights of all concerned,
9  including third parties,  has been allayed by a stipulated and court sanctioned
10  protective order limiting disclosures to this case only and prohibits public
11  dissemination.

12      While federal courts ordinarily recognize that a right of privacy can be raised
13  in response to a discovery request, the privilege is inapplicable to the instant
14  discovery request on the procedural grounds that the persons who hold the privilege
15  have not asserted it. *Laxalt v. McClatchy*, 809 F2d 885 (DC Cir. 1987). Federal law
16  requires a party asserting confidentiality privileges, particularly to records such as
17  these to provide a privilege log (which the defense has not) and a competent
18  declaration under penalty of perjury by a qualified department representative that
19  s/he has personally review each responsive document and provide the appropriate
20  basis supporting each objection. *Kerr v. U.S. District Court for Northern District of*
21  *California* 511 F.2d 192, 199 (9th Cir. 1975)(The claiming official must "have seen
22  and considered the contents of the documents and himself have formed the view that
23  on grounds of public interest they ought not to be produced" and state with
24  specificity the rationale of the claimed privilege. *Chism v. County of San*
25  *Bernardino*. 159 F.R.D. 531 (C.D. Cal. 1994). The absence of the requisite *Chism*
26  custodian declaration and applicable privilege log as to what exists and what
27  privilege is being specifically applied is fatal to defendants privilege objections.
28  *Chism* at p. 533: "If the party opposing production fails to meet its threshold

1    requirement of establishing cause to apply the privilege, the privilege will be
2    overruled and full disclosure will be ordered. *Kelly* v. *City of San Jose,* 114 F.R.D.
3    653, 671, *supra; Miller* v. *Pancucci,* 141 F.R.D. 292, 300, 301.

4        While privacy rights have a legitimate place in litigation, it is axiomatic that
5    an individual's privacy rights are not paramount to the search of truth in litigation.
6    "The constitutional provision does not prohibit all incursions into individual privacy,
7    but provides that any such intervention must be justified by a compelling interest."
8    *Alarcon v. Murphy*, (1988) 201 Cal.App. 3d 1, 5. "The constitutional right [of
9    privacy] is by no means absolute. The state's interest in facilitating the ascertainment
10   of truth in connection with legal proceedings is substantial enough to compel
11   disclosure of a great variety of confidential materials . . .," *County of Alameda v.*
12   *Superior Court*, (1987) 194 Cal.App.3d 254, 260.

13       *El Dorado Savings & Loan Association v. Superior Court*, (1987) 190
14   Cal.App.3d, 342 holds the California constitutional right to privacy will yield to the
15   compelling interest of facilitating the ascertainment of truth in connection with legal
16   proceedings. See also, *Moskowitz v. Superior Court*, (1982) 137 Cal.App.3d 313,
17   316.

18       It has long been recognized no one's privacy rights are paramount to the search
19   of truth in litigation by federal or California law, including a third persons privacy.
20   *Burke v. New York City Police Department*, 115 F.R.D. 220, 225, 228-29 (S.D.N.Y.
21   1987) ordered plaintiff discovery of thousands of internal investigation files spanning
22   more than 5 years containing the identity of thousands of third parties. Likewise in
23   *Skibo v. City of New York* (E.D.N.Y. 1985) 109 F.R.D. 58, 65-66 the Court required
24   disclosure of hundreds of files containing the identity of hundreds of third party
25   witnesses. See also, *Spell v. McDaniel* (E.D.N.C. 1984) 591 F.Supp. 1090,
26   1118(overruling objections to disclosure of years-long complaints by third parties on
27   the ground "Plaintiff's allegations are substantial and brought in good faith. The
28   information requested is simply not available through other discovery or from other

sources. Finally, the importance of the information sought is, by now, manifest and overriding.")

In *Breed v. U.S. Dist. Court for Northern Dist. of California*, (9th Cir. 1976) 542 F.2d 1114, 1115 the Circuit upheld a three-judge district court order which compelled the discovery of the California Youth Authority's personnel and inmate files, permitting disclosure of the identities of dozens of third parties who were in the custody of the Youth Authority because they were relevant to proving the claims being asserted in the action. Addressing the plaintiffs' interest in obtaining such discovery, Federal courts have noted that in balancing privacy interests against the need for disclosure in litigation, relevancy is to be broadly construed.

In *Soto v City of Concord*,(N.D. Cal. 1995) 162 F.R.D. 603 Plaintiff sued for violation of civil rights under 42 U.S.C. § 1983 against the City of Concord Police Department and certain of its police officers. Plaintiff alleges that members of the Concord Police Department, used excessive force while arresting him at his home on February 28, 1993 for outstanding misdemeanor and traffic warrants. In granting discovery over defendant's third party privacy objections, the court held those rights had to yield to the interests of the litigation. "Defendants make a general assertion of the privacy interests of the police officers and witnesses who lodged the complaints. The court in *Kelly* rejects Defendants' reasoning, because a citizen who makes a complaint is not analogous to a confidential informant whose safety may be at risk if anonymity is lost. 114 F.R.D. at 666. "[C]ourts should be less solicitous of finding a significant privacy interest in keeping secret the names of witnesses providing factual information about events which are no longer the subject of investigation or prosecution." *Chism*, 159 F.R.D. at 535 (citing *Kelly,* 114 F.R.D. at 662). Thus, the privacy interests of the citizen complainants in this case are low, and in the absence of special circumstances, little weight should be given to Defendants' interest in preserving the anonymity of these citizen complainants. *Kelly,* 114 F.R.D. at 666." *Soto v. City of Concord (N.D. Cal*. 1995), *supra*, p. 621.

1    Federal law recognizes a right of privacy. *Sanchez v. City of Santa Ana*, 936

2    F.2d 1027, 1033-34 (9th Cir. 1990), *cert. den'd*. 502 U.S. 957, 112 S. Ct. 417 (1991);

3    *Kerr v. United States Dist. Court. for N.D. Cal.*, 426 U.S. 394, 96 S. Ct. 2119 (1976).

4    The privilege is not absolute and invariably falls away when there is subject matter

5    relevance-as it is here. *Lissner v. U.S. Customs* 241 F.3d 1220, 1223 (9th Cir. 2001).

6    The fact that a true § 13300 et. seq. CORI rap sheet may be privileged from

7    discovery in state court actions, is immaterial in that this action is being litigated in

8    a court of the United States in which state law privileges are not recognized,

9    particularly when non disclosure serves to thwart the § 1983 plaintiff's vindication.

10   Evidentiary and discovery issues and privilege claims in federal question cases are

11   clearly governed by federal law. Fed.R.Evid. 501. *Agster v. Maricopa County*, 422

12   F.3d 836 (9th Cir. 2005), *Heathman v. United States District Court* , 503 F.2d 1032,

13   1034 (9th Cir. 1974), *Miller v. Pancucci*, (C.D. Cal. 1992) 141 F.R.D. 292.

## **DEFENDANTS' CONTENTIONS TO REQUEST NO. 10.**

16   Plaintiffs' Request for Production Number 10 is grossly overbroad and seeks

17   confidential local criminal history information that would violate the privacy rights

18   of third parties to this litigation. Likewise, the use of the LARCIS database in a civil

19   proceeding constitutes a misdemeanor crime. Finally, the search results of the

20   LARCIS database is an inappropriate and unreliable method for discovering

21   information about prior acts of misconduct which are similar to the allegations in the

22   complaint.

23       1.    **Criminal History Information Is Confidential under**

24   **California Law**

25   The criminal history information sought by Plaintiff's request is confidential

26   and furnishing this information to Plaintiff in a civil proceeding would constitute a

27   misdemeanor crime.

28   "Any information obtained from the local summary criminal history is

1  confidential and the receiving local government shall not disclose its contents, other
2  than for the purpose for which it was acquired." *Cal. Penal Code* § 13300. *California*
3  *Penal Code* Section 13300 defines "local summary criminal history information" as
4  the master record of information compiled by any local criminal justice agency
5  pertaining to the identification and criminal history of any person, such as name, date
6  of birth, physical description, dates of arrests, arresting agencies and booking
7  numbers, charges, dispositions, and similar data about the person.  Various
8  misdemeanor offenses have been enacted for persons who unlawfully possess or
9  furnish state or local summary criminal history information. *Cal. Pen. Code* §§ 13301
10  to 13305.  Thus, for example, any person authorized by law to receive a record or
11  information obtained from a record who knowingly furnishes the record or
12  information to a person who is not authorized by law to receive the record or
13  information is guilty of a misdemeanor. *Cal. Penal Code* § 1330. Also, an employee
14  of the local criminal justice agency who knowingly furnishes a record or information
15  obtained from a record to a person who is not authorized by law to receive the record
16  or information is guilty of a misdemeanor. *Cal. Penal Code* § 13302.

17       Here, any information contained in the LARCIS database is local summary
18  criminal history information within the meaning of *California Penal Code* Section
19  13300 because it relates to the identification and criminal history of persons arrested
20  within the County.   Accordingly, Plaintiff seeks information that is deemed
21  confidential under California law. Moreover, the purpose of compiling this
22  information is to assist in the identification of suspects accused of crimes.  Here,
23  Plaintiff does not seek this information for the purpose in which it was acquired.
24  Rather, Plaintiff seeks this information as a part of a fishing expedition to discover
25  the names of the persons that the Deputies may have arrested in the past. As a result,
26  compliance with Plaintiff's request would constitute a misdemeanor crime under
27  California law because neither Plaintiff nor his counsel are authorized under
28  *California Penal Code* Section 13300 to receive this information.

## 2. Privacy Rights of Third Parties

Plaintiff's request seeks to invade the privacy rights of third parties to this litigation without good cause. The California Constitution contains an explicit right of privacy that operates against private and governmental entities. Art. I, 1; *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 20, 26. Legally recognized privacy interests include prohibitions against the dissemination or misuse of sensitive and confidential information. *Id.* The dissemination of criminal history information significantly affects an individual's right to privacy as guaranteed by the California Constitution. *Central Valley Ch. 7th Step Foundation, Inc. v. Younger* (1989) 214 Cal.App.3d 145, 151–152 and fn. 3.

Here, the type of aggregated law enforcement information Plaintiff is seeking is not freely available to the public or attorneys and is certainly a highly personal matter for the individual arrested. The third parties who were previously arrested for a drug related offense may or may not have been convicted. Thus, the disclosure of this confidential information could adversely impact the reputation and careers of countless third parties. The public's interest in disclosure of this information is outweighed by the privacy interests of these third parties, particularly when such arrest may have no logical relationship to Plaintiff, the allegations in the complaint or otherwise lead to the discovery of admissible evidence.

## 3. Plaintiff's Request Is Overbroad

Discovery must be narrowly tailored to reveal the nature and extent of the conflict, and must not be a fishing expedition. *Groom v. Standard Ins. Co.*, 492 F.Supp.2d 1202, 1205 (C.D.Cal.2007). Here, Plaintiff's request is not narrowly tailored and appears to be a fishing expedition. Unreliable statistical data concerning the Deputies' prior drug arrests will not lead to the discovery of admissible evidence. The fact that a LARCIS report may identify a prior instance where the deputies made a drug arrest is not relevant to proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident" in this case. The only

1    fact this information tends to prove is that the Deputies may have been identified as

2    an arresting officer in a prior drug arrest. Defendants have already produced all

3    records involving allegations or complaints of misconduct against the Deputies, if

4    any. There is no evidence that the arrests of any third parties were founded upon

5    fabricated evidence or otherwise made complaints against the Deputies. LARCIS

6    does not aggregate data concerning police misconduct; does not reliably track the

7    arrests made by individual deputies. Accordingly, this data should not be used for the

8    improper purpose of discovering information about the arrests of third parties.

9

10

11   DATED: March 8, 2021                **THE BECK LAW FIRM**

12                                       By_____/S/_____
                                              Thomas E. Beck
13                                            Attorneys for Plaintiffs

14   DATED: March 8, 2021                COLLINS, COLLINS, MUIR
                                         AND STEWART
15

16

17                                       By_____/S/_____
                                              Chandler A. Parker
18                                            Attorneys for Defendants

19

20

21

22

23

24

25

26

27

28

29

## DECLARATION OF THOMAS E. BECK

I, THOMAS E. BECK, declare:

1.     I am an active member in good standing of the California State Bar and am counsel for Shaun Marshall and Angelique Crawford, the natural parents of Izabella Marshall and Shayla Marshall.  The facts herein stated are personally known to me of firsthand knowledge, except as to those matters stated on information and belief, and if called as a witness I could testify hereto.

2. This declaration is presented in support of my clients' Motion to Compel Discovery/Overrule Defense Objections.

3.     This action was filed May 18, 2020. The suit alleges, *inter alia*, that Lakewood Sheriff Deputies Ayub Manjra and Michael Perea violated the constitutional rights of Marshall, Crawford and their minor daughters and caused them damages, including the involuntary separation of their minor children based on the deputies fraudulent accusations.

4.     Specifically the federal complaint alleges the defendant deputies corruptly fabricated drug sale charges against Shaun Marshall stemming from Mr. Marshall's arrest in the city of Bellflower January 8, 2019. The complaint alleges these deputies falsely claimed they witnessed a hand to hand methamphetamine sale between Marshall and a person unknown to Mr. Marshall named Sammy Contreras which supposedly occurred at Mr. Marshall's business-Curt's Wheel & Tire Company.  The deputies false report resulted in the filing of criminal charges against Marshall and Contreras.  However, in March, 2019 the accusations against Mr. Marshall were dismissed as the result of an exculpatory surveillance video

1 recording refuting the deputies claimed observations. As the further result of a
2 complaint made directly to District Attorney Jackie Lacey outlining the crimes
3 committed by Deputies Manjra and Perea, they are currently under investigation
4 by LASD's Internal Criminal Investigations Bureau (ICIB) for the felonies
5 committed against Marshall. I am informed and believe felony criminal charges
6 are forthcoming against them both. The plaintiffs have been cooperating with ICIB
7 investigators and the office of the District Attorney.

8

9       5.      I have been practicing police misconduct plaintiff's law since 1978
10 and have litigated dozens of § 1983 cases against the Los Angeles County
11 Sheriffs Department and hundreds more against other law enforcement agencies
12 throughout Southern California. During the deposition of LASD Internal
13 Investigations Bureau (IIB) Captain Thomas Hehir in *Bradley v. County of Los*
14 *Angeles* on August 7, 1987 I learned  LASD had a "Witness/Victim Event Index"
15 designed to store retrievable data from all the crime and arrest reports the
16 department records. I further learned that by using this system, the department
17 had the means to identify every case in which a particular deputy or deputies
18 claiming themselves as on-duty victims or witnesses to crimes allegedly
19 committed by suspects who were arrested and booked. Hehir explained that when
20 the department conducted misconduct investigations internally, they had the
21 means to direct the Event Index to search to identify the arrest reports by deputy
22 name, whether the deputy was the witness or claimed victim  of the offense and
23 the last 3 digits of the URN file number that corresponds to arrested offense.  He
24 illustrated how reports pertaining to a employee could be found and analyzed for
25 patterns or "M.O"s the deputies might use to justify those kinds of arrests.  The
26 system is not limited to criminal investigations but employed by IIB to look into
27 misconduct in at administrative level. Hehir pointed out that the reports are found
28 using the URN file numbers the Event Index identified. He explained the

1  department's investigators used the system to uncover insurance fraud or arson
2  cases and learn from the individual arrest reports if there was a connection
3  between one crime investigation and others like it.

4

5  6.  With this knowledge from that moment forward I discovered the
6  frequency in which deputies were making "contempt of cop" arrests, i.e., arrests
7  of persons who committed no crime but were perceived to have flunked the
8  attitude test. The Event Index matured into LARCIS after the Kolts Commission
9  investigation in the aftermath of the Rodney King debacle required the
10  department develop an "early warning" system to track, by employee, the times
11  arrests for resisting/obstruction or battery on a peace officer were being alleged.

12

13  7.  Attached hereto as Exhibit B is an exemplar of what a LARCIS
14  print-out searching by deputies names and status code numbers unearthed of
15  Deputy Gregory Boghosian and his partner Teresa Acevedo. The long list of 148
16  and 243 arrests meeting search criteria confirmed Deputy Boghosian was the
17  abusive, intemperate and dishonest deputy my client reported him to be and we
18  ultimately had more trial witnesses than we would ever be permitted to put on the
19  stand to testify Boghosian falsified his reports as to them and render opinion
20  testimony of the deputy's dishonest character. I was also able to adduce a pattern
21  of physical abuse excused by supposedly identical aggressive behavior by his
22  disparate victims who did not know about one another, i.e., shouting, cursing,
23  clenching fists, fighting stances. Some of these arrests resulted in citizen
24  complaints that were recorded and investigated, others that were rejected when
25  attempts were made to report the misconduct. Another common thread the many
26  reports revealed was the deputy was invoking the same excuses for using force
27  and causing injuries in the Use of Force reports the department required but did
28  not catalogue or track by employee names.

1     8.     LARCIS discovery has become a gold mine in that not every victim
2   files a personnel complaint, and not every abuse victim knows to file a claim or
3   bring a lawsuit. But the deputy's self reporting of arresting and charging such
4   victims overcomes the shortcomings of discovering only personnel complaints or
5   tort claims and lawsuits.

7     9.     The success I have experienced with LARCIS discovery in some of
8   my cases LASD cases prompted the discovery presently before the court. Given
9   the undeniable proof Manjra and Perea fabricated their witnessing a hand to hand
10   sale between Shaun Marshall and Sammy Contreras, I made the decision to
11   identify a motive for this kind of behavior and issued an inspection demand for a
12   LARCIS search for other hand to hand arrests either or both of them claimed on
13   other occasions. My theory has been fortified by uncovering another hand to
14   hand drug arrest for which Manjra received a Unit Commander's Citation from
15   the Captain of Lakewood station praising Manjra's role in that arrest just slightly
16   more than a year before he accused Shaun Marshall. There is no doubt this
17   evidence will lead me to other hand to hand drug accusations to investigate. As in
18   my false arrest and excessive force cases, LARCIS discovery should shed light
19   not only on Manjra's motive to aggrandize himself but also to identify individuals
20   that may be selected to testify against Manjra and Perea in accordance with FRE
21   404(b), 405 and 608 at the January 2022 trial date assigned to this case. Many of
22   these potential witnesses had never seen or read the reports written about them,
23   just as Contreras stated in a recent interview.

25     10.     Upon receiving Defendants' objections to Inspection Demands and
26   interrogatories December 11, 2020, I promptly invited the defense to meet and
27   confer with me. A copy of that CDLR Rule 37-1 compliance correspondence is
28   appended hereto as Exhibit B. To the defense's credit, it appears the only item

1  the Sheriffs Department decided it wanted to take to the mat is No. 10. I have

2  received supplemental responses to most everything to which objections were

3  made initially  save Inspection Demand No. 9 asking for the reports that would be

4  identified by the LARCIS search detailed in No. 10.  I have to assume the defense

5  is planning to produce the documents identified in No. 9 once the court rules on

6  No. 10.

7       I declare under penalty of perjury that the foregoing is true and correct.

8       Executed this 8th day of March, 2021 at Los Alamitos, California.

34